W. F. MAHER, Appellee, v. MAURICE J. BREEN, Appellant.

No. 44064.

NOVEMBER 23, 1937.

REHEARING DENIED MARCH 12, 1938.

D. M. Kelleher, for appellant.

Maher & Mullen, for appellee.

SAGER, J.—The facts upon which this case is predicated are, in brief outline, these:

The plaintiff, claiming to be the owner and possessor of certain drill plats made many years ago on lands at the time this case arose owned by the defendant and a co-owner, was asked to call on one of the owners, Tom Breen, then in the hospital. Breen apparently thought that the plat supposed to be in the possession of plaintiff indicated that the land of the defendant and his co-owner had under its surface rock valuable for the manufacture of gypsum products. It was believed by him that if the matter were properly called to the attention of the National Gypsum Company, which will hereafter be referred to as the company, the latter would be induced to drill said lands, verify the drillings, and eventually purchase the land at a price satisfactory to the owners.

We follow the record as the jury might have found it if they believed the testimony of the plaintiff.

Having seen Tom Breen, plaintiff was directed by him to see the defendant. Going to the latter's office he was told that an option then held by the company was about to expire without any drilling having been done. There was then discussed the possibility of getting the land drilled, because of plaintiff's real or assumed knowledge of it. Plaintiff told the defendant that he was sure that the company, if it made drillings, would verify the plats made by one Kelley about twenty-five years before and discover valuable deposits of rock under the Breen land. After some discussion with reference to how the defendant acquired his interest and the possible effect of moratory laws, defendant, according to plaintiff's contention, announced that he was anxious to get this land sold and asked plaintiff to assist him. Defendant said that he would attend to the details of any option that might be taken but that plaintiff was to use his best

judgment as to the way to assist defendant and get a deal started which would result in a sale of the land; and, that as compensation for such assistance as the plaintiff might render, if a deal resulted, he (defendant) would pay plaintiff $1,000. Shortly thereafter plaintiff got in contact with one McClure, who seems to have been an experienced driller with whom plaintiff had been acquainted for many years and who had done considerable work for the company. After plaintiff left the defendant's office he met McClure on the street and asked him to call at plaintiff's office, where a conversation to this effect took place: On asking McClure why he did not drill the Breen land the answer was that he had understood that the rock was not very good, whereupon plaintiff assured McClure that Kelley's survey would show in effect that McClure was mistaken; and that if he looked over the Kelley drill sheets the company would be induced to drill and become satisfied that the land was in fact underlaid with what McClure called "excellent stuff." In that conversation McClure, after having examined the Kelley plats, assured plaintiff that he would get in touch with Anderson, superintendent of the local plant, and recommend drilling. The next day Anderson appeared at plaintiff's office saying that McClure had wanted him to come down and look at the "checkings" which plaintiff had on the Breen land. Plaintiff told him that he had these checkings and would be glad to show them; that the Breens had asked him to assist in the sale of this land; and said that the "only way I (plaintiff) could get anything done was through the driller and this superintendent." Anderson examined the drill sheets, took a copy of them, and expressed surprise at what they tended to show, asserting that he would recommend immediate drilling. Following this conversation, and while drillings which resulted therefrom, as plaintiff claims, were going on, plaintiff told the defendant that satisfactory progress was being made. He likewise told defendant that, as their agreement had been oral, he should have a letter verifying the terms of the arrangement under which plaintiff claimed he was working. The original drillings were then produced and examined by the defendant; but defendant said that no written evidence of their contract was necessary. None was in fact written. It should be stated at this point that the Breens had theretofore executed an option to the company, which was about to expire without any drillings having been made, and

that was one of the reasons, if not the only one, why defendant enlisted the services of the plaintiff. Later, when the progress of events led to an eventual sale to the company but before it was consummated, plaintiff appeared at defendant's office and demanded that he be paid the $1,000 he claimed to be due him. This claim was rejected; and, as a result, this lawsuit.

There are many details in the record with reference to plaintiff's experience, and familiarity with this and other lands of a similar character, and other matters which fill in the picture as plaintiff claimed it to be. These need not be here set out.

McClure was called as a witness for the plaintiff and related his experience as a driller, and gave an idea of how much work he had done for the company. The testimony of this witness is somewhat uncertain as to dates and incidental matters, but he seems to have understood his business to such an extent as to have considerable standing with all parties interested in drilling these lands and others in the vicinity. He testified that about the time they started drilling the Breen land he had talked with plaintiff, who asked him to look at Kelley's plats. Having done so he said that he would send Anderson to look them over because they looked very good. After this conversation, and under instructions from Anderson, the superintendent, who had meanwhile examined these plats, he proceeded to drill the land to ascertain the nature and extent of the underlying gypsum rock deposit. While the drilling was going on, one Gustlin was designated by the defendant to watch the drillings to keep defendant in touch with developments.

Anderson, superintendent, testified for the plaintiff to the effect that he called on the latter at his office and asked if he had a drill plat of the Breen property, and if he could see it. The plat was produced and examined. This witness explains his presence there by saying that McClure had told him that he had talked with plaintiff about the Breen land and that it looked pretty good. Having looked over the plats this witness concurred in McClure's view. This conversation took place before the drilling began. Following this the superintendent wrote to the vice-president of the company about it. Following this, Williams, who seems to have been the purchasing agent for the company, appeared and secured an extension of the option theretofore given. After the receipt of letters and telegrams from the officers higher up, Anderson directed drilling to start,

which drilling was completed some time in July. The witness further testified that it was on the basis of information acquired in his conversation with plaintiff that he wrote a letter on June 9 to Tarbell, thus starting the chain of events which led to an eventual sale of the premises by defendant and his then co-owner.

It goes without saying that the defendant denies in practically every important detail the claims thus made py plaintiff, or this case would not be here.

He does admit having had a conversation at one time or another in which he agreed to pay the plaintiff $1,000 for something which is somewhat vague and uncertain, but his position is that, following the conversation in which this $1,000 was mentioned, plaintiff, without indicating whether he had the drill sheets he was supposed to possess or not, and without any indication as to whether he would make an affidavit with reference thereto as was a part of the conversation, walked out of defendant's office and thereafter gave to the defendant no indication of acceptance or of further interest in the matter; that the deal which was eventually consummated resulted from efforts to which the plaintiff in no wise contributed.

There is, in addition to what has already been said, a definite and irreconcilable conflict on dates claimed by each of the parties, which were important to a correct conclusion.

■■■ In its essentials defendant relies on his own testimony. A careful reading of the record persuades us that in overruling the motion to direct a verdict the trial court accurately sized up the situation in the following language:

"As a matter of fact, gentlemen, as has been suggested by counsel here, I can scarcely conceive of a more ideal jury case than this, or wherein the jury can function to better purpose. Every detail of this case,—practically every important detail,— is in sharp dispute, except that at one time there was a proposition to pay plaintiff a thousand dollars for something or other. Aside from that every fact question apparently is in dispute; and as I look at it that is precisely what we have the jury for. I think it is a case where the jury can live up to its dignity as a jury, and set at rest all these disputed facts."

■■■ It follows we are under the necessity of examining defendant's complaint that the court erred in refusing the instruc-

tions requested by him, and in giving those which the court gave on its own motion. In doing so we have examined defendant's complaints out of the order in which they are presented to us.

Division V of defendant's argument complains of the court's refusal to give requested instructions Nos. 1 to 4, inclusive. Instruction 1, in effect, told the jury that the plaintiff could not recover on a contract different from that sued on; instruction 2, that the burden of proof was on the plaintiff to establish that it was through his efforts that a sale was "effected, obtained, and procured." Instructions 3 and 4 are strung upon the same thread, the thought running as a thesis through defendant's argument that plaintiff was suing on a contract under which he was to be paid for making a sale. Defendant's complaint as to instructions 4, 5, and 7, given by the court on its own motion, is, in effect, that they did not present defendant's theory as outlined in requested instructions. We see no merit in this complaint.

Division IV voices the idea that there was error in the giving of instructions Nos. 3 and 6. Instruction No. 3 imposes on the plaintiff the burden of establishing by a preponderance of the evidence that the defendant orally employed plaintiff at the time alleged; that pursuant to such contract plaintiff did assist, and as a result thereof, a sale to the company was effected; and that for such services he was to be paid personally by the defendant the sum of $1,000. Instruction No. 6 emphasizes this somewhat, with the added admonition that the jury was not concerned with the reasonableness of the alleged compensation fixed by the parties themselves. Since the instructions appear to be precisely in line with the case as made by the pleadings we find no error here.

■■■ Divisions I, II, and III of defendant's argument, in addition to matters already considered, urge the contention, strenuously pressed upon us by defendant, that the contract, if any was in fact made with the plaintiff, was a joint one with Tom Breen and the defendant, and that before a sale was consummated this contract became void because, in the language of division 1-C of division I:

"The undisputed evidence also shows that the principal who died, prior to his death conveyed the land or his interest in

the land to another, and that by that act, whether known to the alleged agent or not, any such agency was revoked in that the subject-matter of the alleged agency ceased to be the joint property of the principals.''

Division II of the argument made the same complaint, as indicated by this quotation therefrom:

''The undisputed evidence shows that one of those principals died before there was any sale, and thereby any such agency was revoked.''

Division III presents the argument that:

''The court erred in overruling ground 10 of the defendant's motion for a directed verdict on the question of the revocation of the alleged agency arising from the incapacity of Tom Breen, one of the co-owners * * *. In this connection the court's attention is called to the fact that the evidence of the plaintiff by the witness McClure and the witness Anderson is that no mention was made by plaintiff to them or either of them prior to June 9th, 1936, two weeks before the death of T. ·F. Breen, during all of which time the undisputed evidence shows that he was legally *non compos*.''

Two answers to these contentions readily occur. One is that they were not tendered as issues in the pleadings; the other is that plaintiff was suing on a contract alleged to have been made with the defendant personally. Whether the jury might have believed the defendant rather than the plaintiff does not enter into our deliberations. There was a flat conflict in the testimony, which left it to the jury to determine which of the parties they would believe. We have not set out the instructions considered because to do so would extend this opinion beyond all reasonable length; and we have not analyzed or set forth the authorities cited by the respective parties because they present well-known principles upon which there is no ground of dispute except as to their applicability to the case before us.

Having found no error in the rulings of the trial court, it follows that the case should be, and it is affirmed.—Affirmed.

HAMILTON, C. J., and PARSONS, KINTZINGER, and DONEGAN, JJ., concur.

MITCHELL, J., takes no part.